**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BECKLEY DIVISION**

PATRICIA S. LYONS,        )
                                  )
        **Plaintiff,**        )
                                  )
**v.**                               )        **CIVIL ACTION NO. 5:10-1019**
                                  )
**MICHAEL J. ASTRUE,**      )
**Commissioner of Social Security,**  )
                                  )
        **Defendant.**      )

**PROPOSED FINDINGS AND RECOMMENDATION**

This is an action seeking review of the final decision of the Commissioner of Social Security

denying the Plaintiff's application for Disability Insurance Benefits (DIB) and Supplemental Security

Income (SSI), under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-

1383f. By Standing Order entered August 16, 2010 (Document No. 4.), this case was referred to the

undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit

Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28 U.S.C. §

636(b)(1)(B). Presently pending before the Court are the parties' cross-Motions for Judgment on the

Pleadings. (Document Nos. 11 and 12.)

The Plaintiff, Patricia Sue Lyons (hereinafter referred to as "Claimant"), filed applications for

DIB and SSI on September 6, 2007, alleging disability as of July 16, 2006, due to "severe high blood

pressure, vertigo, panic attacks, hypertension, depression, dizziness, nausea, loss of hearing and/or

sight, cold sweats, and inability to stand for long periods of time due to bad right knee."[1] (Tr. at 11,

---

[1] On her request for reconsideration, Claimant alleged that she was disabled due to the
following impairments: "severe high blood pressure, vertigo, panic attacks, hypertension,
depression, dizziness, nausea, loss of hearing and sight, cold sweats, and inability to stand for long
periods of time due to bad right knee, back, hip, feet, right knee problems that limit ability to

109-12, 113-15, 140.) The claim was denied initially and upon reconsideration. (Tr. at 56-58, 68-70, 71-73.) On April 3, 2008, Claimant requested a hearing before an Administrative Law Judge (ALJ). (Tr. at 74-78.) The hearing was held on August 18, 2009, before the Honorable Theodore Burock. (Tr. at 23-51.) By decision dated September 1, 2009, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 11-22.) The ALJ's decision became the final decision of the Commissioner on June 22, 2010, when the Appeals Council denied Claimant's request for review. (Tr. at 1-4.) Claimant filed the present action seeking judicial review of the administrative decision on August 15, 2010, pursuant to 42 U.S.C. § 405(g). (Document No. 2.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §§ 404.1520, 416.920 (2009). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. §§ 404.1520(a), 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. §§ 404.1520(b), 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. §§ 404.1520(c), 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. §§ 404.1520(d), 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the

function." (Tr. at 68-69, 71.)

2

claimant's impairments prevent the performance of past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. §§ 404.1520(f), 416.920(f) (2009). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently,

3

appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since the alleged onset date, July 16, 2006. (Tr. at 13, Finding No. 2.) Under the second inquiry, the ALJ found that Claimant suffered from "obesity, impairment of the back and knees, headaches, vertigo, depression, and anxiety," which were severe impairments. (Tr. at 13, Finding No. 3.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 15, Finding No. 4.) The ALJ then found that Claimant had a residual functional capacity ("RFC") to perform medium level work as follows:

> [T]he [C]laimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she could have no frequent

5

interaction with others to achieve job tasks; she must work in a low stress environment; she could never climb ladders, ropes, or scaffolds; she could only occasionally climb ramps or stairs as well as perform balancing, stooping, kneeling, and crouching; she could never crawl; she could have no concentrated exposure to extreme temperatures, wetness, noise, or vibration; and she could have no exposure to hazards such as unprotected heights.

(Tr. at 16, Finding No. 5.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 21, Finding No. 6.) On the basis of testimony of a Vocational Expert ("VE") taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a laundry worker, hand packager, and presser, at the medium level of exertion. (Tr. at 21-22, Finding No. 10.) On this basis, benefits were denied. (Tr. at 22, Finding No. 11.)

Claimant's Background

Claimant was born on August 27, 1948, and was 60 years old at the time of the administrative hearing, August 18, 2009. (Tr. at 21, 26, 109, 113.) Claimant has at least a high school education. (Tr. at 21, 139, 145.) In the past, Claimant worked as a retail cashier and an optical assistant. (Tr. at 21, 26, 45, 141, 147-57.)

The Medical Record

The undersigned has reviewed all the evidence of record, including the medical evidence of record, and briefly will address that evidence.

**Dr. Cole**:

The record contains treatment notes from Dr. Billy J. Cole II, D.O., at Access Health Rural Acres, from March 27, 2002, through June 18, 2009. (Tr. at 297-379.) From March 27, 2002 through October 4, 2002, Claimant was followed for hypertension and gastroesophageal reflux disease ("GERD"). (Tr. at 311-13.) It was noted that she was under a lot of stress at work, which contributed to the hypertension, as well as some migraines she experienced. (Id.) Claimant's follow-up exam on February 25, 2003, was unremarkable. (Tr. at 309.) On April 4, 2003, Claimant reported some mild

swelling of her lower extremities, and only trace edema was appreciated on physical exam. (Tr. at 314.) Claimant reported on July 7, 2003, that she was doing well with the exception of some hot flashes. (Tr. at 308.) On October 7, 2003, she reported that her headaches had improved and there was no edema. (Tr. at 315.) Dr. Cole prescribed Prilosec 20mg, Diovan 80mg, and Norvas 5mg. (Id.) Claimant's complaints remained the same through 2006.

On January 30, 2006, Claimant reported some exacerbation of her reflux, due to some increased stressors and heavy lifting at work. (Tr. at 303.) On May 1, 2006, she reported that she was doing generally well and her physical exam was unremarkable. (Tr. at 320.) She complained of nausea and dizziness on July 17, 2006, and it was noted that she had passed out at work. (Tr. at 301.) Physical exam revealed some dizziness with ocular movements. (Id.) Dr. Cole diagnosed symptoms of vertigo and stress induced depression. (Id.) Claimant followed up with Dr. Cole on July 24, 2006, for her vertigo and headache. (Tr. at 300.) Claimant reported increased stressors with several social issues involving her employment and family, and requested therapy. (Id.) Physical exam remained unremarkable. (Id.) On August 23, 2006, Dr. Cole noted that Claimant had been under a lot of stress since having been laid off from her job. (Tr. at 321.) He diagnosed mild anxiety and prescribed Zoloft 50mg, though her physical exam was unremarkable. (Id.)

Claimant reported persisting vertigo symptoms for which she used Antivert 25mg as needed and some occasional paresthesias in her left upper extremity. (Tr. at 299.) Physical exam was unremarkable, but Dr. Cole noted possible carpal tunnel symptoms with her left hand. (Id.) Claimant reported persisting headaches and episodes of dizziness on February 21, 2007. (Tr. at 322.) She stopped taking Ativan because it made her nauseous. (Id.) Physical exam was unremarkable. (Id.) On May 23, 2007, Dr. Cole noted no complaints regarding headaches, vertigo, or pain, except for some dental problems. (Tr. at 297-98.) Dr. Cole's diagnoses included hypertension, GERD, hyperlipidemia,

and anxiety disorder. (Tr. at 297.) On August 22, 2007, Claimant complained of fatigue and malagias, but denied nausea, vomiting, and diarrhea. (Tr. at 324.) Physical exam was normal. (Id.) She complained of increased anxiety due to the death of her father on November 20, 2007. (Tr. at 344.) Dr. Cole noted nothing remarkable on physical exam. (Tr. at 345.) On February 6, 2008, Claimant complained of sinus problems and edema of the left side of her face, and on February 20, 2008, she complained of right jaw swelling, nausea, and diarrhea. (Tr. at 348, 351.) She reported only dental problems on April 15, 2008. (Tr. at 355-57.) On July 2, 2008, Claimant complained of abdominal pain and a possible hernia. (Tr. at 358.) On physical exam, Dr. Cole noted an abdominal wall hernia. (Tr. at 359.) On August 13, 2008, Dr. Cole noted that Claimant was not experiencing any pain or chronic pain. (Tr. at 362.) It was noted that Claimant experienced dental-related pain on September 30, 2008, but no chronic pain. (Tr. at 365.) Nevertheless, Claimant complained of episodes of dizziness and nausea. (Tr. at 366.)

Dr. Cole noted on November 20 and December 29, 2008, that Claimant again did not experience any pain or chronic pain, though she complained of nausea and dizziness on December 29, 2008. (Tr. at 369-71, 372-75.) On April 2, 2009, it was noted that Claimant was experiencing sharp, intermittent pain in her kneecaps, which she rated at a level eight out of ten. (Tr. at 376.) Physical exam, however, was unremarkable and Dr. Cole made no assessment regarding her knee pain. (Tr. at 377-78.)

**Kelly Robinson, M.A. - Psychological Evaluation**:

Kelly Robinson, M.A., a licensed psychologist, completed a psychological evaluation of Claimant on October 23, 2007. (Tr. at 225-29.) Ms. Robinson observed that Claimant's grooming and personal hygiene were fair, that she walked with a normal gait and maintained a normal posture, that she had good use of all her limbs, and that her speech production was good with normal rate and

volume. (Tr. at 225.) Claimant's presenting symptoms included a depressed mood, loss of interest in activities, withdrawal from people, difficulty concentrating, and an increased weight. (Id.) She reported a symptom duration of one year with recent worsening over time. (Id.) Claimant stated that the Zoloft she was taking was not working. (Id.) She further reported unexpected fearful episodes characterized by dizziness, sweating, feelings of nervousness and being closed in, blurred vision, loss of hearing, and heart palpitations. (Tr. at 226.) These episodes occurred daily with a duration of about three minutes. (Id.) She could not identify any precipitating events. (Id.)

On mental status exam Claimant presented with an euthymic mood, a broad and reactive affect, logical and coherent thought processes, a fair insight, and normal judgment. (Tr. at 227.) There was no indication of delusions, obsessive thoughts, compulsive behaviors, or unusual perceptual experiences. (Id.) Her immediate and remote memories were within normal limits but her recent memory was moderately deficient. (Id.) Claimant's social functioning, concentration, persistence, and pace all were within normal limits. (Tr. at 227-28.) She reported her activities to have included doing some housework, performing her own personal care, talking with her boyfriend, watching television, reading novels, and sitting on the porch. (Tr. at 228.) On a weekly basis, Claimant stated that she went to Walmart with her boyfriend for 30 minutes and cooked a meal on the stove top and in the oven. (Id.) Ms. Robinson diagnosed major depressive disorder, moderate, single episode, chronic and panic disorder without agoraphobia. (Id.) She opined that Claimant's prognosis was fair. (Tr. at 229.)

**Dr. Mustafa Rahim, M.D. - Consultative Examination**:

On February 1, 2008, Dr. Mustafa Rahim, M.D., conducted a consultative examination of Claimant. (Tr. at 270-74.) Claimant reported tiredness, weakness, and fatigue; swelling of the lower extremities; nausea and diarrhea; headaches and dizziness; and anxiety and depression. (Tr. at 270-71.) Physical exam revealed a normal neurological exam and only crepitus on the right knee on

9

musculoskeletal exam. (Tr. at 271-72.) Dr. Rahim assessed symptoms suggestive of Meniere's disease; incisional hernia; osteoarthritis; hypertension controlled; and panic disorder and depression controlled. (Tr. at 272.) The x-rays of Claimant's right knee, right hip, and lumbar spine were normal. (Tr. at 275-77.)

**Raleigh General Hospital - Emergency Room Notes:**

Claimant presented to Raleigh General Hospital on August 10, 2008, with complaints of vomiting, diarrhea, and abdominal cramping. (Tr. at 289.) She reported that the condition began months earlier and that she had seen Dr. Cole who wanted to refer her to a specialist but she could not afford to go. (Id.) Claimant's appetite was good and she had vomited only two or three times. (Id.) She described the abdominal pain and cramps as akin to the pain she experienced with gallbladder attacks years ago. (Id.) On physical exam, Dr. Fred Patrick Tzystuck could not appreciate an abdominal wall hernia as reported by Claimant. (Id.) She was slightly hypertensive as she could not keep down her medications. (Id.) The x-ray of Claimant's abdomen was normal. (Tr. at 288.) Claimant did not have any chest pain, shortness of breath, or pain in her back and shoulders. (Tr. at 289.) Dr. Tzystuck therefore, discharged her. (Tr. at 289-90.)

**Dr. Charles F. Bou-Abboud, M.D.**:

On September 18, 2008, Claimant underwent her initial examination by Dr. Charles F. Bou-Abboud, M.D., on referral by Dr. Cole for evaluation of nausea, vomiting, and diarrhea that originated in February, 2008. (Tr. at 295-96.) Claimant reported abdominal pain in the epigastric area that radiated to the umbilical area. (Tr. at 295.) She stated that Phenergan alleviated nausea and vomiting but Lortab only minimized the abdominal pain. (Id.) She also reported a twenty pound weight gain over the last year. (Id.) On physical exam, Dr. Bou-Abboud noted that Claimant was in no distress and presented with only tenderness to palpation without guarding or rebound in the abdomen. (Tr. at 296.)

10

Dr. Bou-Abboud wanted to rule out ulceration, gastritis, hiatal hernia, and Barretts. (Id.) He advised Claimant to elevate the head of her bed four to six inches, to avoid certain foods, and to increase her fiber intake. (Id.) He ordered a diagnostic endoscopy. (Id.)

**FMRS Health Systems, Inc.:**

Claimant underwent a psychiatric evaluation by  Dr. Skiykumar L. Iyer, M.D., a psychiatrist at FMRS Health Systems, Inc., on March 30, 2009. (Tr. at 400-01.) Claimant reported prominent symptoms of depression and anxiety, including sad mood, decreased energy level, lack of interest in activities, erratic sleep and appetite, being isolated, being easily irritated, loss of interest in activities, and poor memory and concentration. (Tr. at 400.) She reported that she experienced panic attacks and avoidance behavior since she was physically attacked in 1979. (Id.) On mental status exam, Claimant was alert and oriented, had a dysphoric mood and an anxious affect, exhibited normal speech and thought process, and had fair insight and judgment. (Tr. at 401.) Dr. Iyer diagnosed major depression and assessed a GAF of 40. (Id.) He gave a differential diagnosis of post traumatic stress disorder. (Id.) He prescribed Cymbalta 60mg, Valium 5 mg twice a day, and individual counseling. (Id.)

Claimant followed up with Dr. Iyer on April 16, 2009, for pharmacologic management. (Tr. at 380, 398.) Dr. Iyer noted that Claimant was compliant with her medication but was experiencing several psychosocial stressors, including her boyfriend having been admitted to the hospital for bipolar disorder. (Id.) Dr. Iyer noted that Claimant was attending counseling at FMRS, which seemed to help. (Id.) On mental status exam, Claimant's mood was fair, her affect was appropriate, and her speech was normal in rate, tone, and volume. (Id.) She had no suicidal or homicidal ideation or plan. (Id.) Her thought process was logical and goal directed and her insight and judgment were good. (Id.) Dr. Iyer diagnosed major depression and generalized anxiety disorder, advised that she continue her medications, and recommended that she follow-up in three months. (Id.)

On July 16, 2009, Dr. Iyer noted that Claimant was doing poorly on her medications and continued to have prominent symptoms of depression and anxiety. (Tr. at 399.) Mental status exam remained unchanged from March. (Id.) Dr. Iyer diagnosed major depression and generalized anxiety disorder, and prescribed Zoloft 100mg and Xanax 1mg twice a day. (Id.)

**Mental & Physical Residual Functional Capacity Assessments**:

### Dr. Reddy:

On October 4, 2007, Dr. Uma Reddy, M.D., completed a form Physical Residual Functional Capacity Assessment, on which she opined that Claimant was capable of performing light exertional level work with limitations. (Tr. at 217-24.) Dr. Reddy's limitations included performing occasional postural activities; never climbing ladders, ropes, or scaffolds, or balancing; avoiding concentrated exposure to temperature extremes and environmental irritants; and avoiding even moderate exposure to noise and vibration(Tr. at 219, 221-22.). Dr. Reddy noted that Claimant's conditions were controlled with medication and that she had not had a vertigo attack since 2006. (Tr. at 222.)

### Dr. Todd:

On November 8, 2007, Dr. John Todd, Ph.D., completed a form Psychiatric Review Technique, on which he opined that Claimant's major depressive and panic disorders were not severe impairments. (Tr. at 230-43.) He further opined that Claimant's ability to maintain her activities of daily living, social functioning, concentration, persistence, and pace were limited only mildly due to her mental impairments, and that she had no episodes of decompensation. (Tr. at 240.)

### Dr. Withrow:

Dr. Curtis Withrow, M.D., completed a form Physical Residual Functional Capacity Assessment on January 11, 2008, on which he opined that Claimant's vertigo, headaches, right knee and hip pain, acid reflux, and high blood pressure limited her to performing work at the medium level

of exertion. (Tr. at 244-51.) Dr. Withrow opined that Claimant was limited to performing postural activities occasionally with the exception that she never climb ladders, ropes, or scaffolds, or crawl. (Tr. at 246.) He further opined that Claimant should avoid concentrated exposure to temperature extremes, wetness, noise, and vibration, and should avoid even moderate exposure to workplace hazards. (Tr. at 248.) Dr. Withrow concluded that Claimant's allegations and the medical evidence demonstrated an "intermittent disturbance affecting posture and apparently the level of consci[o]usness" but noted that it was without a specific documented diagnosis. (Tr. at 251.)

On February 12, 2008, Dr. Withrow reviewed all the new medical evidence and opined that there was no basis to change his original physical RFC assessment of January 11, 2008. (Tr. at 278.)

***Dr. Lilly***:

On January 14, 2008, Dr. Debra Lilly, Ph.D., completed a form Psychiatric Review Technique on which she opined that Claimant's major depressive and anxiety-panic disorders resulted in mild restrictions in maintaining activities of daily living, concentration, persistence, and pace; moderate limitations in maintaining social functioning; and no episodes of decompensation. (Tr. at 252-65.) Dr. Lilly noted that since her initial filing for disability, Claimant made no follow-up for her mental complaints. (Tr. at 264.) She further noted that the treating source notes indicated that Claimant "was generally doing well." (Id.) Dr. Lilly therefore determined that Claimant was only partially credible. (Id.)

Dr. Lilly also completed a form Mental Residual Functional Capacity Assessment, on which she opined that Claimant was moderately limited in her ability to interact appropriately with the general public, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and respond to changes in the work setting. (Tr. at 266-68.) Dr. Lilly opined that Claimant retained "the ability to learn and perform a variety of work-like activities in settings that do not require

13

frequent interactions with others or coping with high levels of stress." (Tr. at 268.)

***Dr. Cole***:

On July 1, 2009, Dr. Billy J. Cole, D.O., completed a form Medical Assessment of Ability to Do Work-Related Activities (Physical). (Tr. at 394-97.) Dr. Cole opined that Claimant could lift and carry ten to fifteen pounds occasionally, stand two hours for fifteen minutes at a time, occasionally balance and stoop, and never climb, crouch, kneel, or crawl. (Tr. at 394-95.) He indicated that her ability to sit also was affected by her impairments. (Tr. at 395.) Dr. Cole imposed environmental restrictions regarding exposure to heights, temperature extremes, chemicals, dust, fumes, and humidity. (Id.) He also opined that Claimant should occasionally finger or perform fine manipulation with the left hand. (Tr. at 396.)

Claimant's Challenges to the Commissioner's Decision

Claimant alleges that the ALJ's decision is not supported by substantial evidence because the ALJ erred in failing to accord adequate weight to the opinions of Claimant's treating physician, Dr. Cole, and to the state agency reviewing physician, Dr. Reddy. (Document No. 11 at 4-7.) Regarding Dr. Cole, Claimant asserts that the ALJ improperly discounted his opinion concerning Claimant's limitations and gave greater weight to the opinion of Dr. Withrow, a non-examining physician. (Id. at 5.) Claimant states that the ALJ overlooked her complaints of right knee pain, which pain was exacerbated by Claimant's increasing obesity. (Id. at 5-6.) Claimant also argues that the ALJ improperly gave significant weight to Dr. Withrow's opinion over Dr. Reddy's opinion that Claimant was limited to light work, without explaining the discrepancy in his assignment of weight. (Id. at 6.) Claimant notes that both Drs. Withrow and Reddy reviewed identical medical information, yet the ALJ failed to explain why Dr. Withrow's opinion was entitled more weight. (Id.)

In response, the Commissioner asserts that Dr. Cole's extreme limitations were neither

supported by Dr. Cole's treatment notes nor the objective medical evidence of record. (Document No. 12 at 10-13.) The Commissioner notes that Dr. Cole's treatment notes reflect minimal complaints of knee pain and on several occasions Dr. Cole specifically indicated that Claimant experienced no pain. (Id. at 11.) The other evidence of record revealed normal knee x-rays and essentially normal physical exams with the exception of right knee crepitus. (Id. at 12.) Similarly, the exams of Claimant's hands and wrists were normal, and an MRI of her brain when ordered for her headaches, was negative. (Id. at 12-13.) Though Claimant argues that her knee pain increased as her weight increased, the Commissioner notes that Dr. Cole failed to list obesity as a contributing factor on the form he completed regarding Claimant's limitations. (Id. at 13.) Consequently, the Commissioner asserts that the limitations set forth by Dr. Cole are not supported by the substantial evidence of record. (Id.)

The Commissioner further asserts that the ALJ properly assigned little weight to Dr. Reddy's opinion and assigned significant weight to Dr. Withrow's opinion because it was more consistent with the record as a whole. (Document No. 12 at 13-16.) Though both Drs. Reddy and Withrow initially reviewed identical information, the Commissioner points out that Dr. Withrow reviewed the additional evidence of Dr. Rahim's consultative examination and the x-ray reports he ordered, and affirmed his opinion in February, 2009. (Id. at 14.) The Commissioner asserts that the mild objective medical findings, including the normal x-rays and physical findings as found by Dr. Rahim, in addition to those findings at the time of Dr. Withrow's initial opinion, more strongly support his less onerous limitations. (Id. at 14-15.) The Commissioner further asserts that Dr. Withrow's limitations were consistent with Claimant's conservative treatment. (Id. at 15.) Additionally, the Commissioner notes that Claimant's gastrointestinal issues, which included a hiatal hernia and GERD, did not justify severe limitations. (Id.) The Commissioner further notes that Dr. Cole failed to specify any gastrointestinal problems, or any related condition, as findings supporting his limitations. (Id. at 16.) Consequently,

15

the Commissioner asserts that Dr. Withrow's opinion was more consistent with the substantial evidence of record and was entitled greater weight that Dr. Reddy's opinion. (Id.)

Claimant finally alleges that the ALJ erred in finding that Claimant was not entirely credible. (Document No. 11 at 4, 7-8.) Specifically, Claimant asserts that the ALJ failed to evaluate properly the intensity, persistence, and functionally limiting effects of Claimant's complaints of dizziness, nausea, and vertigo. (Id. at 7-8.) Furthermore, Claimant asserts that the ALJ failed to consider the consistency of Claimant's statements, the longitudinal record of treatment, her attempts of seek treatment, and her daily activities in determining that she was not entirely credible. (Id. at 8.)

In response, the Commissioner asserts that the ALJ's determination that Claimant was capable of greater sustained activity than she alleged was supported by the mild objective medical findings, the conservative treatment she received, and her inconsistent reporting of symptoms. (Document No. 12 at 16-20.) For example, the Commissioner notes that despite Claimant's allegation of constant pain in her knees and back, Dr. Cole's treatment notes reflected that she experienced no pain in August, November, and December, 2008. (Id. at 17.) The x-rays in February, 2008, were normal and though Dr. Rahim diagnosed osteoarthritis and noted crepitus of the right knee, he observed that she had normal movement and range of motion, and had no swelling, redness, or warmth of any joint. (Id.) Likewise, Dr. Rahim observed normal range of hip motion without pain, full flexion in her lumbosacral spine, negative straight leg testing, and lack of tenderness. (Id.) Claimant was able to squat and walk on her heels and toes, her brain MRI was negative, and she had no weakness or numbness associated with her headaches. (Id.)

Regarding Claimant's complaints of dizziness, nausea, and vertigo, the Commissioner asserts that she received conservative treatment for her complaints and that neurological exams were normal. (Id. at 18.) The Commissioner notes that her complaints of nausea or vomiting were not continuous,

16

but rather were intermittently reported. (<u>Id.</u> at 18-19.) Even when she alleged such symptoms, however, the Commissioner notes that they were not disabling. (<u>Id.</u> at 19.) Finally, the Commissioner notes that Dr. Cole's treatment notes in July, 2008, reflected only a possible hernia and did not mention vertigo, nausea, or vomiting. (<u>Id.</u>) Consequently, the Commissioner asserts that the relatively mild objective medical findings and conservative treatment did not support the severity of Claimant's alleged symptoms, and therefore, the substantial evidence of record supports the ALJ's decision that Claimant was not fully credible. (<u>Id.</u> at 20.)

<u>Analysis</u>.

1. <u>Opinion Evidence</u>.

Claimant first alleges that the ALJ erred in failing to give adequate weight to the opinions of her treating physician and a state agency reviewing physician. At steps four and five of the sequential analysis, the ALJ must determine the claimant's residual functional capacity for substantial gainful activity. "RFC represents the most that an individual can do despite his or her limitations or restrictions." <u>See</u> Social Security Ruling 96-8p, 61 Fed. Reg. 34474, 34476 (1996). Pursuant to SSR 96-8p, the RFC assessment "must be based on all of the relevant evidence in the case record," including " the effects of treatment" and the "limitations or restrictions imposed by the mechanics of treatment; e.g., frequency of treatment, duration, disruption to routine, side effects of medication." Looking at all the relevant evidence, the ALJ must consider the claimant's ability to meet the physical, mental, sensory and other demands of any job. 20 C.F.R. §§ 404.1545(a), 416.945(a) (2009). "This assessment of your remaining capacity for work is not a decision on whether you are disabled, but is used as the basis for determining the particular types of work you may be able to do despite your impairment(s)." <u>Id.</u> "In determining the claimant's residual functional capacity, the ALJ has a duty to establish, by competent medical evidence, the physical and mental activity that the

17

claimant can perform in a work setting, after giving appropriate consideration to all of her impairments." Ostronski v. Chater, 94 F.3d 413, 418 (8th Cir. 1996).

Opinions on a claimant's Residual Functional Capacity are issues that are reserved to the Commissioner. The Regulations state that:

> We use medical sources, including your treating source, to provide evidence, including opinions, on the nature and severity of your impairment(s). Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to subpart P of part 404 of this chapter, your residual functional capacity . . . or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.

See 20 C.F.R. § 416.927(e)(2) (2009).

> In determining what a claimant can do despite his limitations, the SSA must consider the entire record, including all relevant medical and nonmedical evidence, such as a claimant's own statement of what he or she is able or unable to do.  That is, the SSA need not accept only physicians' opinions.  In fact, if conflicting medical evidence is present, the SSA has the responsibility of resolving the conflict.

Diaz v. Chater, 55 F.3d 300, 306 (7th Cir. 1995) (citations omitted).

The Regulations state that opinions on these issues are not medical opinions as described in the Regulation dealing with opinion evidence (20 C.F.R. §§ 404.1527(a)(2) and 416.927(a)(2)); rather, they are opinions on issues reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e) and 416.927(e). For that reason, the Regulations make clear that "[w]e will not give any special significance to the source of an opinion on issues reserved to the Commissioner. . . ." Id. §§ 404.1527(e)(3) and 416.927(e)(3). The Regulations further provide that "[f]or cases at the Administrative Law Judge hearing or Appeals Council level, the responsibility for deciding your residual functional capacity rests with the Administrative Law Judge or Appeals Council." See 20 C.F.R. §§ 404.1545 and 416.946 (2009). However, the adjudicator must still apply the applicable factors in 20 C.F.R. § 416.927(d) when evaluating the opinions of medical sources on issues reserved

to the Commissioner. <u>See</u> Social Securing Ruling ("SSR") 96-5p, 61 FR 34471, 34473 (1996).

Social Security Ruling 96-5p makes a distinction between an RFC assessment, which is "the adjudicator's ultimate finding of 'what you can still do despite your limitations,'" and a "'medical source statement,' which is a 'statement about what you can still do despite your impairment(s)' made by an individual's medical source and based on that source's own medical findings." <u>Id.</u> SSR 96-5p states that "[a] medical source statement is evidence that is submitted to SSA by an individual's medical source reflecting the source's opinion based on his or her own knowledge, while an RFC assessment is the adjudicator's ultimate finding based on a consideration of this opinion and all the other evidence in the case record about what an individual can do despite his or her impairment(s)." Adjudicators "must weigh medical source statements under the rules set out in 20 C.F.R. § 416.927, providing appropriate explanations for accepting or rejecting such opinions." <u>Id.</u> at 34474.

Every medical opinion received by the ALJ must be considered in accordance with the factors set forth in 20 C.F.R. §§ 404.1527(d) and 416.927(d) (2009). These factors include: (1) length of the treatment relationship and frequency of evaluation, (2) nature and extent of the treatment relationship, (3) supportability, (4) consistency, (5) specialization, and (6) various other factors. Additionally, the Regulations state that the Commissioner "will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." <u>Id.</u> §§ 404.1527(d)(2) and 416.927(d)(2).

Under §§ 404.1527(d)(1) and 416.927(d)(1), more weight is given to an examiner than to a non-examiner. Sections 404.1527(d)(2) and 416.927(d)(2) provide that more weight will be given to treating sources than to examining sources (and, of course, than to non-examining sources). Sections 404.1527(d)(2)(I) and 416.927(d)(2)(I) state that the longer a treating source treats a claimant, the more weight the source's opinion will be given. Under §§ 404.1527(d)(2)(ii) and

416.927(d)(2)(ii), the more knowledge a treating source has about a claimant's impairment, the more weight will be given to the source's opinion. Sections 404.1527(d)(3), (4) and (5) and 416.927(d)(3), (4), and (5) add the factors of supportability (the more evidence, especially medical signs and laboratory findings, in support of an opinion, the more weight will be given), consistency (the more consistent an opinion is with the evidence as a whole, the more weight will be given), and specialization (more weight given to an opinion by a specialist about issues in his/her area of specialty). Unless the ALJ gives controlling weight to a treating source's opinion, the ALJ must explain in the decision the weight given to the opinions of state agency psychological consultants. 20 C.F.R. §§ 404.1527(f)(2)(ii) and 416.927(f)(2)(ii) (2009). The ALJ, however, is not bound by any findings made by state agency medical or psychological consultants and the ultimate determination of disability is reserved to the ALJ. Id. §§ 404.1527(f)(2)(I) and 416.927(f)(2)(I).

In evaluating the opinions of treating sources, the Commissioner generally must give more weight to the opinion of a treating physician because the physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. See 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2009). Nevertheless, a treating physician's opinion is afforded "controlling weight only if two conditions are met: (1) that it is supported by clinical and laboratory diagnostic techniques and (2) that it is not inconsistent with other substantial evidence." Ward v. Chater, 924 F. Supp. 53, 55 (W.D. Va. 1996); see also, 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2009). The opinion of a treating physician must be weighed against the record as a whole when determining eligibility for benefits.  20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2) (2009). Ultimately, it is the responsibility of the Commissioner, not the court to review the case, make findings of fact, and resolve conflicts of evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). As noted above, however, the Court must not abdicate its duty to scrutinize the record as a whole to determine whether the

Commissioner's conclusions are rational. <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974).

If the ALJ determines that a treating physician's opinion should not be afforded controlling weight, the ALJ must then analyze and weigh all the evidence of record, taking into account the factors listed in 20 C.F.R. §§ 404.1527 and 416.927(d)(2)-(6).

The ALJ reviewed the opinions of Drs. Cole and Reddy and concluded that their opinions were entitled little weight. (Tr. at 20.) Regarding Dr. Cole's opinion, the ALJ noted that it was the only opinion from a treating source. (<u>Id.</u>) The ALJ determined nevertheless that neither Dr. Cole's treatment records, nor the other objective evidence of record supported his limitations. (<u>Id.</u>) He specifically noted that Dr. Cole's extreme limitations were due to osteoarthritis and degenerative joint disease with joint pain, which involved her left thumb joint. (Tr. at 18, 20.) Contrary to Claimant's allegation, Dr. Cole did not impose any limitations on Claimant due to her obesity, though her obesity was supported by the record. (Tr. at 18.) As the Commissioner emphasizes, Claimant's weight increased from 205 pounds in May, 2007, to 221 pounds in April, 2009. (Document No. 12 at 13.) Though Claimant alleged back and knee pain as a disabling condition and testified as to the pain she suffered therefrom, Dr. Cole failed to make any specific diagnosis regarding her back and knee. (Tr. at 18.) Furthermore, as the ALJ noted, Dr. Cole's treatment notes did not reflect any indication of back or knee pain until April, 2009. (<u>Id.</u>) Dr. Cole noted on April 2, 2009, that Claimant experienced sharp, intermittent pain in her kneecaps, which pain she rated at a level eight out of ten. (Tr. at 18, 20, 376.) The physical exam of her knee, however, was unremarkable. (<u>Id.</u>) Regarding Claimant's headaches, the ALJ noted that Claimant occasionally reported such headaches to Dr. Cole, and he never made a specific diagnosis regarding the headaches. (Tr. at 18.)

The ALJ further found that the other objective evidence of record did not support Dr. Cole's assessed limitations. (Tr. at 20.) As the ALJ noted, and as summarized above, the x-rays of

21

Claimant's spine, knee, and hip were negative. (Id.) The physical exam by Dr. Rahim essentially was unremarkable, with the exception of some right knee crepitus. (Tr. at 18.) Claimant had normal range of motion, was able to walk and squat without difficulty, and exhibited negative straight leg raising. (Id.) Regarding her headaches, Dr. Rahim noted that Claimant's brain scan was negative and he opined that the headaches were vascular in nature. (Tr. at 19.) Concerning the alleged vertigo, nausea, and vomiting, with a several month history, the emergency room notes in August, 2008, reflected a normal abdominal x-ray, and it was noted that she was not dehydrated. (Id.) Finally, the ALJ noted that Claimant generally received conservative care for her conditions and did not require any specialized treatment. (Id.)

Accordingly, in view of the foregoing, the undersigned finds that the ALJ's decision to give little weight to the opinion of Dr. Cole is supported by substantial evidence.

Claimant further alleges that the ALJ erred in giving greater weight to the opinion of Dr. Withrow than to the opinion of Dr. Reddy. (Document No. 11 at 5-6.) The ALJ gave significant weight to Dr. Withrow's opinion because it placed Claimant on "medium work with postural and environmental limitations largely adopted" by the ALJ in his RFC assessment. (Tr. at 20.) He noted that Dr. Withrow's opinion was "most consistent with the record as a whole." (Id.) The ALJ gave little weight to Dr. Reddy's opinion because it limited Claimant to light work, which was not supported by the record as a whole. (Id.) Both Drs. Withrow and Reddy essentially reviewed identical medical evidence in formulating their opinions. Dr. Withrow, however, concluded that the evidence demonstrated intermittent disturbances affecting posture and the level of consciousness, without any specific diagnosis. (Tr. at 251.) He affirmed his opinion in February, 2008, after reviewing the new medical evidence, which would have included Dr. Rahim's consultative examination and the x-rays he ordered, and possibly Dr. Bou-Abboud's treatment notes if they were not initially considered. (Tr.

22

at 278.) The ALJ found that Dr. Withrow's opinions were most consistent with the evidence of record as a whole and that Dr. Reddy's opinion that limited Claimant to light work was unsupported by the evidence. Consequently, for the reasons stated above regarding Dr. Cole and Dr. Rahim, the undersigned finds that the ALJ's decision to give greater weight to the opinion of Dr. Withrow than to Dr. Reddy is supported by the substantial evidence of record.

2. Pain and Credibility Analysis.

Claimant next alleges that the ALJ erred in assessing her symptoms and credibility. (Document No. 10 at 8-10.) A two-step process is used to determine whether a claimant is disabled by pain or other symptoms. First, objective medical evidence must show the existence of a medical impairment that reasonably could be expected to produce the pain or symptoms alleged. 20 C.F.R. §§ 404.1529(b) and 416.929(b) (2009); SSR 96-7p; See also, Craig v. Chater, 76 F.3d 585, 594 (4th Cir. 1996).  If such an impairment is established, then the intensity and persistence of the pain or symptoms and the extent to which they affect a claimant's ability to work must be evaluated. Id. at 595.  When a claimant proves the existence of a medical condition that could cause the alleged pain or symptoms, "the claimant's subjective complaints [of pain] must be considered by the Secretary, and these complaints may not be rejected merely because the severity of pain cannot be proved by objective medical evidence." Mickles v. Shalala, 29 F.3d 918, 919 (4th Cir. 1994). Objective medical evidence of pain should be gathered and considered, but the absence of such evidence is not determinative. Hyatt v. Sullivan, 899 F.2d 329, 337 (4th Cir. 1990). A claimant's symptoms, including pain, are considered to diminish her capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical and other evidence.  20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4) (2009).  Additionally, the Regulations provide that:

[w]e will consider all of the evidence presented, including information about your prior

23

work record, your statements about your symptoms, evidence submitted by your treating, examining, or consulting physician or psychologist, and observations by our employees and other persons. . . . Factors relevant to your symptoms, such as pain, which we will consider include:

> (i) Your daily activities;

> (ii) The location, duration, frequency, and intensity of your pain or other symptoms.

> (iii) Precipitating and aggravating factors;

> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;

> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms;

> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 or 20 minutes every hour, sleeping on a board, etc.); and

> (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) (2009).

SSR 96-7p repeats the two-step regulatory provisions:

> First, the adjudicator must consider whether there is an underlying medically determinable physical or mental impairment(s)--i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques--that could reasonably be expected to produce the individual's pain or other symptoms. * * * If there is no medically determinable physical or mental impairment(s), or if there is a medically determinable physical or mental impairment(s) but the impairment(s) could not reasonably be expected to produce the individual's pain or other symptoms, the symptoms cannot be found to affect the individual's ability to do basic work activities.

> Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's pain or other symptoms has been shown, the adjudicator must evaluate the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities. For this purpose, whenever the individual's statements about the intensity, persistence, or functionally limiting effects

of pain or other symptoms are not substantiated by objective medical evidence, the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.

SSR 96-7p, 1996 WL 374186 (July 2, 1996). SSR 96-7p specifically requires consideration of the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms" in assessing the credibility of an individual's statements. Significantly, SSR 96-7p requires the adjudicator to engage in the credibility assessment as early as step two in the sequential analysis; i.e., the ALJ must consider the impact of the symptoms on a claimant's ability to function along with the objective medical and other evidence in determining whether the claimant's impairment is "severe" within the meaning of the Regulations. A "severe" impairment is one which significantly limits the physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1520(c) and 416.920(c).

Craig and SSR 96-7p provide that although an ALJ may look for objective medical evidence of an underlying impairment capable of causing the type of pain alleged, the ALJ is not to reject a claimant's allegations solely because there is no objective medical evidence of the pain itself. Craig, 76 F.3d at 585, 594; SSR 96-7p ("the adjudicator must make a finding on the credibility of the individual's statements based on a consideration of the entire case record"). For example, the allegations of a person who has a condition capable of causing pain may not be rejected simply because there is no evidence of "reduced joint motion, muscle spasms, deteriorating tissues [or] redness" to corroborate the extent of the pain. Id. at 595. Nevertheless, Craig does not prevent an ALJ from considering the lack of objective evidence of the pain or the lack of other corroborating evidence as factors in his decision. The only analysis which Craig prohibits is one in which the ALJ rejects allegations of pain solely because the pain itself is not supported by objective medical evidence.

The ALJ noted the requirements of the applicable law and Regulations with regard to assessing

25

pain, symptoms, and credibility. (Tr. at 16-17.) The ALJ found at the first step of the analysis that Claimant's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." (Tr. at 17.) Thus, the ALJ made an adequate threshold finding and proceeded to consider the intensity and persistence of Claimant's alleged symptoms and the extent to which they affected Claimant's ability to work. (Tr. at 17-18.) At the second step of the analysis, the ALJ concluded that Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the residual functional capacity assessment." (Tr. at 18-19.)

The ALJ first considered Claimant's subjective symptoms in assessing her credibility. (Tr. at 17.) Claimant testified regarding her persistent knee and back pain and migraine headaches. (Id.) She further testified to her episodes of vertigo, as well as her anxiety and depression. (Id.) Finally, Claimant testified as to her functional limitations. (Id.) The ALJ then assessed Claimant's credibility by reviewing the factors set forth in the Regulations. The ALJ first noted that the record was devoid of any acute findings and reflected that Claimant received conservative care. (Tr. at 18.) The ALJ addressed Claimant's obesity and knee pain, as discussed above. (Id.) He then noted that Dr. Cole's notes failed to reflect any specific diagnosis regarding her back and knee pain and that the x-rays and other diagnostic tests were normal. (Id.) The ALJ next addressed Dr. Rahim's findings and noted that they conflicted with Claimant's allegations regarding pain and headaches. (Tr. at 18-19.) Finally, as discussed above, the ALJ reviewed Claimant's complaints of vertigo and found that she was treated conservatively with medications and that though she reported persistent nausea, vomiting, and diarrhea, she was not dehydrated in August 2008. (Tr. at 19.)

Regarding her mental impairments, the ALJ noted that she was treated conservatively with medications. (Tr. at 19-20.) He noted that the record reflected that Claimant saw Dr. Iyer only three

26

times between March and July, 2009. (Tr. at 19.) The ALJ rejected Dr. Iyer's GAF of 40 at her initial examination because it was inconsistent with the evidence of record. (Tr. at 20.) Dr. Iyer's notes revealed that she had normal speech, thought processes, insight, and judgment. (Id.) The ALJ determined that Dr. Iyer's GAF of 40 was based solely on Claimant's initial subjective reports, and therefore, was inconsistent with the other evidence of record. (Id.) Additionally, Ms. Robinson did not find any severe mental impairments as indicated by Dr. Iyer's GAF. (Id.) Dr. Lilly assessed a few moderate limitations regarding Claimant's ability to interact with the public and get along with her peers. (Id.)

Accordingly, in view of the foregoing, the undersigned finds that the ALJ's credibility assessment conformed to the factors set forth in the Regulations and was supported by the substantial evidence of record.

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Court confirm and accept the foregoing findings and **RECOMMENDED** that the District Court **DENY** the Plaintiff's Motion for Judgment on the Pleadings (Document No. 11.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 12.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable Irene C. Berger, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then fourteen days (filing of objections) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.

Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.  Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155, 106 S.Ct. 466, 475, 88 L.Ed.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.Ed.2d 933 (1986); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.Ed.2d 352 (1984). Copies of such objections shall be served on opposing parties, Judge Berger, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: August 18, 2011.

R. Clarke VanDervort
United States Magistrate Judge

28